[Nos. D014563, D014591. Fourth Dist., Div. One. June 1, 1993.]

PALOMAR MOBILEHOME PARK ASSOCIATION, Plaintiff and Appellant, v.
MOBILE HOME RENT REVIEW COMMISSION, Defendant and Respondent.
CITY OF SAN MARCOS, Real Party in Interest and Respondent.

482

COUNSEL

Jagiello & Pech and Robert J. Jagiello for Plaintiff and Appellant.

Endeman, Lincoln, Turek & Heater, Donald R. Lincoln and Linda Reich Duncan, Brown, Harper, Burns & Hentschke, Brown, Divan & Hentschke and Daniel S. Hentschke for Real Party in Interest and Respondent.

## OPINION

**WIENER, Acting P. J.**—Plaintiff Palomar Mobilehome Park Association, owner of two mobilehome parks in the city of San Marcos (City), appeals the denial of its petitions for writ of mandate to compel the City and its Mobile Home Rent Review Commission (Commission) to grant a requested increase in the rents which can be charged for spaces in the Palomar Estates West and Palomar Estates East mobilehome parks. While we reject the majority of Palomar's arguments—including its principal contention that the park owner must be assured a fair rate of return on the *current value* of the property—we agree that factual issues remain to be resolved before the Commission's decision to deny any increase can be approved. Accordingly, we reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

The City first enacted a mobilehome rent control ordinance in 1978. Under the current version of the ordinance, mobilehome park owners may

adjust rates once in any 12-month period by giving written notice to both the City and the homeowners. Rents for all spaces in the park must be adjusted at the same time.

Homeowners may seek review of a park owner's proposed rate increase if they believe it is excessive. Review is initiated by a petition filed with the City and signed by homeowners from 50 percent of the spaces in the park. The San Marcos City Council, serving as the Commission, then conducts a rent review hearing at which the park owner has the burden of establishing by a preponderance of the evidence "that a proposed space rent increase is reasonable and is necessary to enable the mobilehome park owner to receive a just and reasonable return on his investment."

Palomar West is a 474-space park and Palomar East is a 372-space park. Both were completed in 1979 and are situated on leased land, with 47 years remaining on the lease.

On January 31, 1990, Palomar filed a notification of proposed rent increase for both the Palomar West and Palomar East parks. Rents at Palomar West were proposed to be increased to a uniform $514 per month, an average increase of $179 or 53.4 percent. Rents at Palomar East were proposed to be increased to a uniform $423 per month, an average increase of $168 or 65.9 percent. Petitions filed by the residents of both parks in February requested a rent review hearing. The hearings began in April and were continued by mutual consent of the parties until June when the Commission voted three to two to deny Palomar any increase on either park.

## DISCUSSION

The principal question is whether the San Marcos City Council acting as the City's Commission, denied this mobilehome park owner its constitutionally guaranteed fair rate of return on its investment by refusing to grant a proposed rent increase. What appears at first blush to be a simple question of substantial evidence turns out to be something considerably more complex when one realizes that the formula for arriving at a "fair return" is hotly debated in economic circles and has been the subject of sparse, scattered and sometimes conflicting comment by appellate courts. In particular, only the broad outlines have been discussed in California decisions.

The fundamental issue we are therefore required to decide is what factors must be considered in determining how much rent a landlord can charge. We

decide that issue in the context of the particular facts of this case, examining whether the evidence before the Commission will fairly support its decision to deny any rent increase. Beyond the principal issue, we must also address Palomar's additional argument the Commission decision is invalid because two Commission members refused to disqualify themselves on grounds of bias.

1. *Did the Commission err in concluding that Palomar failed to demonstrate it was not receiving a fair return on its investment?*

The San Marcos ordinance adopts "fair return on investment" as the standard by which the Commission must judge whether a rent increase is warranted. ▮ As its initial argument, Palomar asserts that park owners are constitutionally guaranteed a fair return on the total value of their property. This would allow increased rent where the value of the property has appreciated since the time of purchase and would, in contrast to the fair-return-on-investment approach, result in similar rents for similar properties, regardless of differences in the time and method of acquisition, financing arrangements and other factors. Unfortunately for the park owners, both the United States and California Supreme Courts have already ruled that a fair-return-on-value standard is not constitutionally mandated and that a fair-return-on-investment approach is acceptable. (*Duquesne Light Co.* v. *Barasch* (1989) 488 U.S. 299, 308-310 [102 L.Ed.2d 646, 657-659, 109 S.Ct. 609]; *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 686 [209 Cal.Rptr. 682, 693 P.2d 261], affd. on other grounds, 475 U.S. 260 [89 L.Ed.2d 206, 106 S.Ct. 1045].) In *Fisher*, involving a facial challenge to the Berkeley rent control ordinance, the California Supreme Court held that an investment-based standard can be applied constitutionally even though it results in lower revenues than a value-based standard. (*Id.* at p. 686; accord, *Power Comm'n* v. *Hope Gas Co.* (1944) 320 U.S. 591, 605 [88 L.Ed 333, 346, 64 S.Ct. 281].)[1]

Having established "fair return on investment" as the governing standard, the San Marcos ordinance does not further define this concept or specify what the park owner must demonstrate in order to justify an increase. Instead, a nonexclusive list of factors is provided which the commission "shall" consider, most of which relate to changes which have occurred in the last year: "(1) changes in the mobilehome park owner's gross income from

---

[1]Palomar suggests that in *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 161, 771 P.2d 1247] the California Supreme Court backed away from *Fisher* by endorsing a "reasonable return on the value of the property" standard. (*Id.* at p. 819.) The portion of the case to which Palomar refers is a quote from a 1926 United States Supreme Court case being cited for the proposition that an unreasonably low current rate of return cannot be justified by past excessive profits. *Calfarm* can in no way be read to impliedly overrule or even question *Fisher*.

the operation of the mobilehome park; (2) changes in the reasonable operating expenses relating to the operation of the mobilehome park; (3) whether the proposed rent increase will result in an increase in net income to the park owner from the operation of the park; (4) changes in the Consumer Price Index for the time period from the last rent increase; (5) changes in the services, amenities, maintenance and condition of the mobilehome park and the extent to which the rent increase is necessary to provide the services or amenities or to insure maintenance and good operating condition of the park; (6) the extend [*sic*] to which the rent increase is necessary to pay for capital improvements and the amount of money allocated by the owner to a capital improvement or maintenance fund, along with the park owner's budget for maintenance, care and capital improvements for the park; and (7) the extent to which the landlord receives net income from fees or charges for services billed separately from rent."

Because the list of factors in the ordinance is expressly nonexclusive, neither of the parties use them as the touchstone for their analysis. One Commission member, however, partially justified his vote to deny any rent adjustment because of the conceded 1989 increase in Palomar's net operating income and the Commission's briefing before this court at one point suggests that its ultimate conclusion was proper because Palomar made no attempt to support the proposed rent increase by reference to the seven factors in the ordinance.

By focusing largely on changes which have occurred since the preceding year, the San Marcos ordinance could be read to suggest that maintenance of net operating income (NOI) is the standard to define a "fair" rate of return. The maintenance-NOI approach has been praised by commentators for both its fairness and ease of administration. (See e.g., Baar, *Guidelines for Drafting Rent Control Laws: Lessons of a Decade* (1983) 35 Rutgers L. Rev. 723, 809-816.) It was approved by this court in *Oceanside Mobilehome Park Owners' Assn.* v. *City of Oceanside* (1984) 157 Cal.App.3d 887 [204 Cal.Rptr. 239].

The problem with relying on the maintenance-NOI approach here is that Palomar argues it has never received a "fair" return since the advent of rent control. Whether this assertion is true is, we suspect, a debatable proposition. Had the San Marcos ordinance established a prerent control base year which was presumed to have provided the park owner with a fair return subject to rebuttal,[2] that debate could have focused on Palomar's income during the base year. Having failed to establish such a framework in the ordinance, the

---

[2]Another suggested alternative to assure fair base year rents is to combine the maintenance-NOI standard with a one-time percentage-NOI adjustment. (See Baar, *op. cit. supra*, 35 Rutgers L. Rev. at p. 814.)

City cannot now justify the denial of a rent increase merely by pointing to the fact that Palomar's NOI has not decreased.

At least since the United States Supreme Court decision in *Power Comm'n v. Hope Gas Co., supra,* 320 U.S. 591, it has been established that there is no single constitutionally required formula which must be utilized when government seeks to regulate the price charged for a good or service. (See also *Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 191 [Cal.Rptr. 284, 672 P.2d 1297].) Although Hope explained that "it is the result reached not the method employed which is controlling" (*id.* at p. 602 [88 L.Ed.2d at pp. 344-345]), this does not mean that price controls can be evaluated independent of the rationale used to justify them. Rather, a governmental entity may choose to regulate pursuant to any fairly constructed formula even though other proper formulas might allow for higher prices.

■ In attempting to justify the decision to deny any rent increase, the City places principal reliance on a modified "prudent investment" or "historical cost" approach approved by the United States Supreme Court in the *Hope Gas Co.* case. (See *Duquesne Light Co. v. Barasch, supra,* 488 U.S. at p. 309 [102 L.Ed.2d at p. 658].) This approach suggests taking the price paid for the property and deducting accumulated depreciation to arrive at a net historic value. The annual profit or loss is then augmented by adding back any interest expense and the resulting amount is divided by the net value. The calculations for the two parks are as follows:

Palomar West

| | |
|---|---|
| Acquisition cost | $10,388,000 |
| Less accumulated depreciation | 2,982,607 |
| Net historic value | 7,355,393 |
| | |
| 1989 Loss | - 471,592 |
| 1989 Interest expense | 912,073 |
| Operating profit | 439,481 |
| | |
| Rate of return ($439,481 divided by $7,355,393) | 6.0% |

Palomar East

| | |
|---|---|
| Acquisition cost | $5,674,000 |
| Less accumulated depreciation | 1,785,258 |
| Net historic value | 3,888,742 |
| 1989 Loss | - 298,720 |
| 1989 Interest expense | 600,357 |
| Operating profit | 301,636 |

Rate of return
($301,636 divided by $3,888,742)                7.8%

Palomar takes issue with the City's approach on several levels. It first argues that "historic cost" approach effectively transfers to tenants the use of $11 million in assets (the difference between the historic cost of the property and its current value) free of charge. It is true that in calculating a "fair" return, the City's proffered formula does not give park owners credit for any appreciation in the value of their property. Yet this is true any time a "fair return on investment" approach is used in lieu of a "fair return on value" formula. As we have explained (see *ante*, p. 485), both the United States and California Supreme Courts have approved the "investment" approach as constitutionally permissible. We are in no position to hold to the contrary by accepting Palomar's value-based test as a constitutional minimum.

Palomar also complains that the City's formula refuses to treat interest expense on the debt incurred to purchase the parks as legitimate. This argument ignores the fact that the City's approach treats the total purchase price of the asset as the park owner's "investment" rather than merely the amount of cash invested. Where the calculation of the park owner's return is based on the cost of the asset—normally a much larger figure—it makes no sense to deduct interest incurred to purchase the asset as an expense.

Moreover, Palomar's version of the "historic cost" formula means that an owner's fair return will vary depending on the financing arrangements. Assume two identical parks both purchased at the same time for $1 million each. Park A is purchased for cash; Park B is heavily financed. Under Palomar's approach, calculating return based on total historic cost and treating interest payments as typical business expenses would mean that Park A would show a considerably higher operating income than Park B. Assuming a constant rate of return, the owners of Park B would be entitled to charge higher rents than the owners of Park A. We see no reason why this should be the case.

Finally, Palomar challenges the specific application of the "historic cost" formula on the facts of this case. It argues there was no evidence to support the City's implicit conclusion that a 6 or 7.8 percent rate of return was "fair" in light of uncontradicted expert testimony concerning comparable investments which established a 10 percent minimum. Palomar also faults the City for failing to account for moneys expended for capital improvement, which it contends should increase the net historic value and, in turn, the amount of rent which can be charged.

As to the rate of return, the City asserts that the nominal rate must be augmented by the extent to which the property has appreciated. We understand the City's argument that the "return" on a piece of investment property should include both short-term return, in the form of rents, and long-term return, which is reflected by the appreciated value of the property realizable only when the property is sold. Here, there is considerable evidence to indicate that the park property has appreciated since it was purchased in 1984.

We cannot disagree with the theory of the City's argument. It is commonly understood that in the case of "growth" stocks where there is recognized potential for appreciation of the principal, investors are willing to accept little or no short-term return in the form of devidends. In "income" stocks where appreciation is less likely, investors demand higher short-term return. But it is not, as the City suggests, merely a matter of calculating the amount of appreciation and dividing by the number of years of ownership to determine the annual yield due to appreciation. Rather, the concept should operate here as it does with regard to stocks such that the potential for appreciation may be shown to affect the rate of return. Thus, an expert testifying as to the rate of return on comparable investments should take into account the potential for appreciation in assessing the sort of investment which is comparable. Presumably, the greater the anticipated appreciation, the lower the rate of return which investors will demand. Here, the record before the Commission does not indicate that potential appreciation was considered in determining the appropriate rate of return.[3]

Palomar also properly challenges the City's failure to include certain capital expenditures as an addition when calculating the "historic cost" of Palomar West. It correctly argues that the addition of new sewer shutoff valves was a capital improvement which should be reflected in a higher base figure from which Palomar's return can be calculated.

---

[3]Given the nature of that record we decline to speculate on how an expert might determine the potential for appreciation in the value of property subject to rent control.

Under these circumstances, the superior court judgment denying Palomar's petitions for writ of mandate must be reversed. The Commission will be directed to hold a new hearing on Palomar's rent increase requests at which evidence may be presented to show the effect of potential appreciation in calculating the appropriate rate of return. As to Palomar West, the Commission should also recalculate the "historic cost" of the investment by adding the amount of any capital improvements. Based on this new information, the Commission should again decide whether an increase in rents is warranted.[4]

*2. Was Palomar deprived of a fair hearing because two commissioners failed to disqualify themselves on grounds of bias?*

At the commencement of the hearing before the rent review commission, Palomar submitted declarations from two park owners relating statements made by two commissioners at a breakfast meeting over two years before the hearing. The commissioners allegedly told the park owners that the park residents were their constituents, not the park owners, and that no rent increases would be granted "the second time around." When asked about the request for disqualification, the chair of the Commission (one of the challenged commissioners) replied that the request was being denied. "We don't agree with the statements that you provided and feel that there's no reason to disqualify ourselves from this hearing." Palomar made no attempt to pursue the matter further and specifically did not request a hearing at which the declarants and challenged commissioners could testify.

Palomar has the burden of demonstrating that the participation of the challenged commissioners in the hearing deprived it of due process. Here, as the superior court noted, the commissioners denied the statements were made as alleged. Further, the length of time since the breakfast meeting and the strong interest of the declarants in the subject of the hearing cast serious doubt on the accuracy of the allegations. Having failed to at least request further proceedings at which the issue could be explored, Palomar has failed to meet its burden of demonstrating it was deprived of a fair hearing.

[4]In view of our conclusion it is unnecessary to address Palomar's additional contention that the failure of the San Marcos ordinance to identify a precise formula or necessary factors more specifically violates due process because park owners are unaware of what they must demonstrate to justify a rent increase. We note that a similar approach listing nonexclusive factors was approved by the California Supreme Court in *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 168 [130 Cal.Rptr. 465, 550 P.2d 1001] and again in *Carson Mobilehome Park Owners' Assn. v. City of Carson, supra,* 35 Cal.3d at pp. 190-191.) More importantly, it is difficult to see how Palomar could be prejudiced by such a nonexclusive list unless it could show it had relevant evidence it reasonably chose not to produce.

## DISPOSITION

Judgment reversed. The superior court is instructed to issue a writ directing the Commission to conduct a new rent increase review hearing consistent with the dictates of this opinion. Each party will bear its own costs.

Work, J., and Nares, J., concurred.